Filed 7/14/26  P. v. Stine CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL RAYMOND STINE,<br>    Defendant and Appellant. | C101601<br><br>(Super. Ct. No. F20-000344) |

A jury found defendant Michael Raymond Stine guilty of premeditated murder. On appeal, defendant contends the record provides insufficient support for the jury's findings he acted with premeditation, a lack of self-defense, a lack of imperfect self-defense, and a lack of heat of passion.  Defendant also asserts several instructional errors, one prosecutorial error, and cumulative error based on these claims.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Shelby Comeaux lived in a room in defendant's house in a rural area of Nevada County.  Comeaux was in constant pain due to prior injuries and had limited mobility of his arms.  Comeaux was known to be a friendly person who was not easy to anger. William C. also lived in defendant's house in exchange for working in defendant's cannabis garden.

Comeaux and defendant had known each other for two decades, but the relationship deteriorated in the two years before October 2020, in part because defendant

1

blamed Comeaux for a large amount of cannabis disappearing from his property. Defendant had become increasingly aggressive and quick to anger. Unprovoked, he would yell at people, poke them with his finger, or jab them with his elbow while walking by. Defendant often began drinking alcohol every day between noon and 1:00 p.m. and became increasingly aggressive throughout the night, especially to Comeaux. Defendant was also known to carry a pocketknife, which had a four-inch blade that locked when opened.

Defendant's behavior caused the men to adopt a routine. William would work in the cannabis garden most days until 3:00 p.m. or 4:00 p.m., then he would work in the kitchen preparing permit applications for the cannabis garden. Comeaux spent most of his time on the back deck of the house keeping to himself before going to bed around 9:00 p.m. At least five times after Comeaux went to bed, defendant held a knife to William's throat, threatening to kill William.

In May or June 2020, defendant and Comeaux got into a fight on the back deck. It started when Comeaux got a call from a mutual friend, who told Comeaux defendant was angry and wanted to fight Comeaux. When defendant got home, he went to the back deck and called Comeaux derogatory names. Defendant then went back and forth between the inside of the house and the back deck, each time calling Comeaux derogatory names. After four hours of this behavior, defendant pushed Comeaux, who then threw defendant backwards.

In early October 2020, defendant would often complain to others about Comeaux's lack of respect towards him and say he was going to kill Comeaux. Defendant often delivered these statements in a similar manner as threats he delivered to others, which never amounted to anything. Other times, defendant said, "If [Comeaux] puts his hands on me again, I will have to kill him." Defendant had also told William that, if he were going to kill Comeaux, he would kill William first so it would be easier to kill Comeaux.

2

On October 6, 2020, defendant and Comeaux got into another fight. Comeaux told William defendant elbowed him and Comeaux threw defendant to the ground. Defendant told William Comeaux had attacked him, but also that defendant had elbowed Comeaux because he was standing too close.

At around noon on October 8, 2020, defendant went to the store with a friend and purchased a bottle of scotch. This was abnormal for defendant, who was known for drinking only whiskey. Defendant and his friend were stuck in road closures for approximately an hour on their way back to defendant's house. During the delay, defendant started drinking the scotch out of the bottle. By the time defendant's friend dropped him off at home, defendant was in a bad mood. William came into the house around 3:00 p.m. At approximately 3:30 p.m., defendant came in from the back deck and told William that, if Comeaux ever touched him again, he was going to kill Comeaux. Defendant appeared under the influence of alcohol. Defendant spent the rest of the day in the living room drinking scotch.

Around 8:00 p.m., defendant came into the kitchen and argued with Comeaux and William before going back to the living room. Comeaux went to bed around 9:00 p.m. About 20 minutes later, defendant came into the kitchen and pounded the tip of his knife into the counter. He started crying and talking about his generosity. Defendant appeared angry. Defendant left the kitchen with his knife and returned 15 minutes later pointing the knife at William and screaming he was going to kill Comeaux if Comeaux ever touched him again. Comeaux then came into the kitchen, put his cell phone on the countertop to record the conversation, and repeatedly asked defendant if defendant was threatening him.[1] The two men began to argue. Defendant folded his knife and put it in his pocket. When Comeaux's back was to defendant, defendant took the knife from his

---

[1] The audio recording was played for the jury.

pocket, opened it, and put it back in his pocket. Defendant left the kitchen to look for his phone.

Defendant then quickly walked up to Comeaux and pushed him. Comeaux pushed defendant off him. This happened again. Defendant then yelled for Comeaux to stop touching him. William and Comeaux told defendant Comeaux was not touching or attacking him. Defendant went back to the living room, with Comeaux and William telling him to drop his knife. Defendant then rushed back into the kitchen with his head lowered and drove into Comeaux's chest, pushing him into the counter. The men grappled with each other around the kitchen, hitting the stove and refrigerator. Defendant punched Comeaux's abdomen in an upward motion and both men fell to the floor. Comeaux yelled that defendant had stabbed him. William helped disarm defendant and called 911.

When William went outside to assist first responders through the front gates, he saw that defendant had changed the locks on the gates. William then went inside the house to get the updated keys and saw that defendant had moved Comeaux from where he had fallen on the kitchen floor and was holding a new knife in his hand. When William entered the kitchen, Comeaux yelled for William to get defendant off him. Comeaux later died from two stab wounds to the chest and abdomen, one extending to his heart.

After his arrest, defendant gave a statement to officers. Defendant said Comeaux had lived with him for two years and was a fully disabled veteran who could barely walk. He described Comeaux as an alcoholic and drug addict, who had become aggressive in the months prior and had attacked him multiple times. Defendant said that Comeaux had come into the kitchen that evening, became aggressive, smashed a window bloodying his hand, and put defendant in a choke hold. According to defendant, Comeaux then grabbed a kitchen knife and started cutting defendant. Defendant said he grabbed a knife and defended himself.

4

At trial, defendant testified he knew Comeaux had a violent past that included murder. Defendant knew Comeaux to be physically fit enough to reroof his home and use a chainsaw four to five days a week. Defendant testified Comeaux's behavior became alarming starting in November 2019 and caused defendant to want Comeaux to move out of defendant's house. Defendant was consistent with his prior statement that Comeaux was an alcoholic and prescription drug addict who attacked him in the kitchen in a fit of rage after accusing defendant of threatening him. Defendant testified he thought Comeaux was going to kill him.

At trial, the jury was instructed on self-defense or defense of another, murder based on malice, first degree murder based on premeditation and deliberation, the effect of provocation on the degree of murder, and voluntary manslaughter based on theories of heat of passion or imperfect self-defense/defense of others. A jury found defendant guilty of first degree murder based on a premeditation and deliberation theory. The trial court sentenced defendant to 25 years to life in prison.

Defendant appeals.

DISCUSSION

I

*Sufficient Evidence Supports Defendant's Conviction For First Degree Murder*

Defendant contends insufficient evidence supports the jury's finding he acted with premeditation and deliberation and a lack of self-defense and heat of passion. We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the

5

evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)

" 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' "  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  In *Anderson*, our Supreme Court sought "to clarify the difference between the two degrees of murder" and to "set forth standards … for the kind of evidence [that] is sufficient to sustain a finding of premeditation and deliberation."  (*People v. Anderson* (1968) 70 Cal.2d 15, 25-26.)  It identified three "types" or "categories" of evidence that it "has found sufficient to sustain a finding of premeditation and deliberation," namely, evidence of (1) planning activity, (2) motive, and (3) manner of killing.  (*Id*. at pp. 26-27.)  It then explained, "Analysis of the cases will show that [our Supreme C]ourt sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with either [planning] or [manner of killing]."  (*Id*. at p. 27.)  "Evidence concerning planning, motive, and manner of killing are pertinent to this determination, but these factors are not exclusive nor are they invariably determinative."  (*People v. Marks* (2003) 31 Cal.4th 197, 230.)  "Since *Anderson*, [our Supreme Court has] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight."  (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

As to planning activity, three witnesses testified defendant had threatened to kill Comeaux several times in the year before the stabbing and several times on the day of the murder.  This demonstrated defendant reflected and thought about killing Comeaux over time, including the day he stabbed Comeaux.  While defendant argues his threats were

conditional, that Comeaux issued threats to him as well, and defendant was known to make threats to others without acting upon them, the evidence showed defendant's threats and aggressive behavior toward Comeaux were different than his behavior towards others. Indeed, the evidence demonstrated defendant was especially aggressive towards Comeaux and specifically targeted Comeaux with his anger and threats before the killing. Further, witnesses testified Comeaux was not an aggressive person and was generally friendly. Thus, while there was evidence demonstrating defendant's threats to kill Comeaux could have been idle threats, there is also evidence pointing to the contrary. We must adopt the reasonable inference that supports the judgment. (*Covarrubias*, *supra*, 1 Cal.5th at p. 890.)

As to motive, William testified defendant voiced anger about Comeaux's lack of respect to defendant for allowing Comeaux to live in his house. Further, defendant and Comeaux's mutual friend testified that, several years before the stabbing, defendant's relationship with Comeaux deteriorated after defendant blamed Comeaux for his missing cannabis. This, combined with defendant's ongoing anger and resentment towards Comeaux, demonstrated that defendant had a motive to kill him. Defendant challenges this conclusion, arguing the evidence shows he merely wanted Comeaux to move out of his house, which Comeaux had planned to do. Again, defendant's interpretation of the evidence is but one interpretation. Defendant and Comeaux had been friends for over 20 years and Comeaux had lived with defendant for more than two years. Given the mounting tension between the men and defendant's statements regarding his frustration with Comeaux, evidence supports the conclusion defendant held a motive to kill Comeaux.

As to the manner of killing, William testified that, during the confrontation, defendant opened his closed pocketknife and put it in his pocket in the open position. After doing so, defendant pushed Comeaux several times and yelled for Comeaux to stop touching him even though, as William testified, Comeaux was not touching defendant.

7

Defendant then walked back to the living room before rushing towards Comeaux and initiating a physical fight where defendant then stabbed Comeaux with the opened pocketknife. It was reasonable for the jury to interpret this evidence as defendant planning to use his pocketknife to attack Comeaux in a surprise burst of aggression that would catch Comeaux unguarded and unable to defend himself. It was further reasonable for the jury to conclude from this evidence that defendant sought to minimize his culpability in the audio recording of the confrontation by making false statements, knowing his behavior was criminal in nature.

Moreover, William testified that after Comeaux's stabbing, he disarmed defendant and left the house to assist emergency responders only to discover defendant had changed the locks to the gates. This evidence established defendant took steps before the confrontation to prevent help from timely arriving. Thus, we conclude the record does contain sufficient evidence to support a rational jury finding defendant acted with deliberation and premeditation.

Defendant disagrees that his possession and use of a knife demonstrated a manner of killing indicative of premeditation because the evidence established he was always in possession of the knife. While the evidence established defendant was in constant possession of a pocketknife, the relevant evidence is not defendant's mere possession, but his actions with the knife before he stabbed Comeaux. In that regard, the evidence demonstrated defendant's actions were not the actions of a person acting in response to a threat or other provocation. Defendant put his knife into a useable position out of sight of his victim and then physically rushed at him to stab him in vital areas of the body. This evidence supports the jury's finding defendant deliberated and reflected on his conduct before acting on his preconceived design to deliver fatal wounds to Comeaux. (See *People v. Anderson*, *supra*, 70 Cal.2d at pp. 26-27.)

Defendant finally points to all the evidence and argues it does not support a finding he acted with premeditation because it demonstrated he was under the influence

8

of alcohol and responded to being verbally and physically accosted by a larger man by defending himself in a frenzied manner with the knife he was known to always possess. Defendant's argument amounts to a reweighing of the evidence, which we are not permitted to do in a sufficiency of the evidence analysis. (*Covarrubias*, *supra*, 1 Cal.5th at p. 890.) As discussed, the evidence sufficiently supported the jury's finding of premeditation and deliberation.

Related to this argument, defendant also contends the evidence was insufficient to demonstrate he acted with a lack of heat of passion, as well as a lack of perfect and imperfect self-defense, as required for a finding of premeditated murder. Not so. As described, the record includes evidence of defendant's ongoing animosity toward Comeaux and his preparation to inflict deadly force in the minutes before stabbing Comeaux. Further, the evidence established defendant was not reacting to provocation from Comeaux, who asked defendant if he was making threats and responded to defendant's acts of physical aggression. This evidence provides a sufficient evidentiary basis to find defendant acted with a lack of heat of passion and instead deliberative thought. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 584 [a finding of heat of passion requires that the provocation cause an ordinary, reasonable person to react from passion rather than from judgment].)

Further, the evidence showed defendant, without provocation on the part of Comeaux, created the verbal and then physical altercation between himself and Comeaux, by issuing threats to Comeaux, pushing Comeaux, and then rushing towards him with a knife. This provides a sufficient evidentiary basis to find defendant acted with a lack of perfect or imperfect self-defense. (See *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [self-defense cannot be invoked by an initial aggressor]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 [imperfect self-defense cannot be invoked if the "defendant's conduct creates circumstances where the victim is *legally* justified in

9

resorting to self-defense against the defendant"].) Accordingly, sufficient evidence supports the jury's finding defendant acted with premeditation and deliberation.

## II

### *There Was No Instructional Error*

Defendant raises several challenges to the jury instructions, arguing that, as given, the instructions left the jury misunderstanding the intent requirement for premeditated first degree murder. Not only does defendant fault the trial court for failing in its sua sponte duty to instruct on these principles but, in the event the court did not have a sua sponte duty, he argues his counsel was ineffective for failing to ensure the jury was fully instructed on the intent requirement. To avoid defendant's ineffective assistance of counsel claim (*People v. Crittenden* (1994) 9 Cal.4th 83, 146), and because defendant argues the errors infringed on his substantial rights (§ 1259; *People v. Cabral* (2004) 121 Cal.App.4th 748, 750), we will reach the merits of his arguments and determine whether the instructions inaccurately stated the mental state required for premeditated murder. We reject each of defendant's contentions in turn.

## A

### *Factual And Legal Background*

Regarding murder, the jury was first instructed with the principle of self-defense and defense of others using a modified version of CALCRIM No. 505. This was followed by CALCRIM No. 520, which instructed on murder with malice aforethought, including both express and implied malice. As to malice, the jury was instructed: "Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time." The instruction ended by stating: "If you decide that the defendant committed murder, it is murder of the second degree, unless the [prosecution] ha[s] proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521."

10

The next instruction was CALCRIM No. 521, defining first degree murder as one that is willful, deliberate, and premeditated. As to intent, the instruction stated: "The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if he decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

The jury was then instructed that the presence of provocation could reduce a murder from first degree to second degree or to manslaughter via CALCRIM No. 522. This was then followed by CALCRIM No. 570 and CALCRIM No. 571, defining voluntary manslaughter based on heat of passion and on imperfect self-defense, respectively. The instruction detailing imperfect self-defense included the standard language that defendant acted in imperfect self-defense if he actually believed he was in imminent danger of being killed and actually believed the immediate use of deadly force was necessary to defend against danger, but at least one of those beliefs was unreasonable. (CALCRIM No. 571) Both voluntary manslaughter instructions ended by informing the jury that, to find him guilty of murder, the prosecution had the burden of proving beyond a reasonable doubt defendant did not kill as a result of the theory detailed in the instruction.

On appeal, we review " 'the wording of a jury instruction de novo' " and "determine[] whether 'the instructions are complete and correctly state the law.' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.) We examine the entire charge of the

11

court to determine whether the instructions are adequate (*People v. Pena* (1984) 151 Cal.App.3d 462, 475) and whether it is reasonably likely that the instructions as a whole caused the jury to misapply the law (*People v. Cain* (1995) 10 Cal.4th 1, 36). " ' "[We] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions [that] are given." ' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

B

*The Trial Court Accurately Instructed On The Theories Of Murder*

Defendant contends the jury should have been instructed with CALCRIM No. 500 because the instruction would have explained how the different theories of murder interact with each other. We disagree and conclude the trial court adequately instructed on the principles contained in CALCRIM No. 500.

Defendant argues the jury should have been instructed as follows, based on CALCRIM No. 500: "Homicide is the killing of one human being by another. Murder and manslaughter are a type of homicide. The defendant is charged with murder and manslaughter. Manslaughter is a lesser offense to murder. [¶] A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed. I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide. I will also instruct you on the different types of murder and manslaughter."

All the above principles were addressed in the given instructions. The definition of homicide was contained in CALCRIM No. 520. This instruction together with CALCRIM Nos. 570 and 571 adequately told the jury murder and manslaughter are types of homicide and defendant was charged with manslaughter as a lesser offense to murder.

12

Whether and under what circumstances a homicide is lawful was addressed in CALCRIM No. 505's definition of self-defense and defense of others. The remainder of defendant's proposed instruction pertains to how these concepts relate to one another, a concept the jury heard by correlating the instructions given and determining whether defendant acted in self-defense, with malice, or under provocation. We assume the jury is capable of correlating these instructions. (See *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) Accordingly, the jury was properly instructed about the principles of murder and how they relate to one another.

## C

*The Jury Was Instructed It Was Required To Find*

*Defendant Acted With A Lack Of Heat Of Passion*

*And Imperfect Self-defense To Find Him Guilty Of Murder*

Defendant argues the instruction about malice murder (CALCRIM No. 520) was required to include language about the prosecution's burden of proving defendant did not act in heat of passion or with imperfect self-defense. As a result, defendant argues, the jury did not understand the prosecution's burden to disprove certain theories to obtain a conviction for first degree murder. Not so. The jury was instructed the prosecution had the burden to disprove heat of passion and imperfect self-defense to convict defendant of murder, as detailed in the manslaughter instructions. (CALCRIM Nos. 570-571.) Again, we presume the jury read all the instructions and was able to correlate and understand these instructions. (See *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.) Accordingly, the jury was properly instructed.

## D

*The Jury Was Properly Instructed About Imperfect Self-defense*

Defendant argues the instruction about manslaughter on an imperfect self-defense theory should have included language about excessive force. Specifically, defendant argues the instruction was insufficient because it failed to tell the jury that a homicide

13

qualifies as voluntary manslaughter when a defendant's belief in danger and the need to use deadly force are reasonable but *the sort of* deadly force he uses is excessive. We disagree.

As defendant notes, Division Four of the First District Court of Appeal considered and rejected a similar argument in *People v. Morales* (2021) 69 Cal.App.5th 978, 995-997. We adopt that reasoning here. The *Morales* court noted no authority supports the position that one type of deadly force could be reasonable but another could be excessive. (*Id*. at p. 996.) "The relevant consideration is whether a defendant uses more force than is necessary to repel an attack, not the type of deadly force used by a defendant." (*Ibid*.) If a defendant reasonably believes there is a need for force but uses more force than what is necessary, the defendant cannot claim perfect self-defense. (*Id*. at p. 995.) As a result, a defendant likewise cannot in such circumstances claim imperfect self-defense. (*Ibid*.) That means that if defendant reasonably believed that Comeaux's actions justified his use of force but he used more than what was necessary, he could not claim perfect or imperfect self-defense. Accordingly, the jury was not instructed with inaccurate law by omitting defendant's proposed excessive force language from the instructions.

E

*The Instructions Adequately Informed The Jury*

*How To Consider Defendant's Voluntary Intoxication*

Defendant argues the jury should have been instructed with CALCRIM No. 625, even though he did not request the instruction, so the jury could accurately understand the effect of voluntary intoxication on its determination of defendant's intent. We disagree.

Defendant argues the jury should have been instructed as follows, based on CALCRIM No. 625: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way[.] You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with premeditation and deliberation. [¶] A person is intoxicated if he becomes intoxicated by

14

willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.  [¶]  You may not consider evidence of the defendant's voluntary intoxication for any other purpose."

There is no sua sponte duty to instruct on the effect of voluntary intoxication on the mental states required for murder.  (§ 28, subd. (b); *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120.)  Rather, voluntary intoxication is more like a pinpoint instruction to which a defendant is entitled on request.  (*Saille*, at p. 1119 ["[pinpoint instructions] are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte"]; *People v. Ricardi* (1992) 9 Cal.App.4th 1427, 1432 [no sua sponte duty to instruct on voluntary intoxication but must give this instruction on request].)  This is because " ' "[pinpoint] instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' " (*People v. Barrett* (2025) 17 Cal.5th 897, 957.)  Without the pinpoint instruction, the instructions as a whole still instruct on the pertinent law.  (Cf. *People v. Kimble* (1988) 44 Cal.3d 480, 503 [instructions are required sua sponte as to the principles of law openly and closely related to the evidence; instructions amplifying an element of an offense are required only upon a request].)

For example, here, the instruction regarding premeditation and deliberation (CALCRIM No. 521) provided:  "[D]efendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.…  [¶]  …  The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances.  A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated.  On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection, not the length of time."  This adequately informed the jury to consider defendant's particular circumstances, including his intoxication, when determining whether he acted deliberately.  This was further made clear during defense

counsel's closing argument when he argued to the jury that defendant could not have acted deliberately or with premeditation given his intoxication. Accordingly, the jury was adequately instructed about how to consider defendant's voluntary intoxication when determining his intent.[2]

### III

### *There Was No Prosecutorial Error*[3]

During closing arguments, the prosecution said: "Defense counsel is focusing on certain aspects of the evidence and wants you to do exactly that. When they say things like it's not premeditated because he was drinking, he wouldn't have been drinking, that's not the law. The law was misstated over and over and over. It's not you have to be perfect, you have to be certain, that's not the law." Defense counsel objected arguing the standard related to the burden of proof was a near certainty. The trial court responded by saying: "I'm going to overrule the objection. [¶] Just remind the jurors what you hear

---

[2]   At oral argument, defendant cited *People v. Tzul* (Mar. 23, 2026, B343256), petition for review denied and opinion ordered depublished June 17, 2026, S296356, for the proposition that prejudicial error occurs when a trial court's ruling compels a defendant to testify and the resulting testimony contributes to the jury's finding of intent. Defendant argued a similar error occurred in his case in relation to the court's failure to give the voluntary intoxication instruction. Not so. There is no indication in the record that the court's failure to give the voluntary intoxication instruction compelled defendant to testify. Indeed, the voluntary intoxication instruction was never addressed during the jury instruction conference and the jury instruction conference occurred after defendant had already begun giving his testimony. Accordingly, *Tzul* does not support defendant's claim of error. Further, after oral argument in this case, *Tzul* was ordered depublished and is thus not citable. (Cal. Rules of Court, rule 8.1115(a), (b).)

[3]   Defendant often refers to the prosecutor's conduct as misconduct. "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

16

and what you've heard is evidence and what I tell you is the law is what you're to follow. What the attorneys say is not evidence. So remember that."

Defendant contends this constituted prosecutorial error because the prosecutor misstated the burden of proof, the law regarding voluntary intoxication, and disparaged defense counsel. Defendant recognizes he objected only to the first claim of error, but argues his attorney was ineffective for failing to object to the rest. We exercise our discretion to reach the merits of defendant's claim to avoid defendant's ineffective assistance claims. (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 146.) We reject each of defendant's prosecutorial error contentions in turn.

Prosecutorial error "occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.] Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.)

When it comes to closing argument, "the prosecution is given wide latitude to make ' "fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." ' " (*People v. Parker* (2022) 13 Cal.5th 1, 72.) It is error to disparage defense counsel in front of the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1193.) Our Supreme Court, however, has found no impropriety in egregious prosecutorial remarks aimed solely at the persuasive force of defense counsel's closing argument. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"In order to be entitled to relief under state law, [the] defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35.) "Under federal law, relief is

not available if 'the challenged conduct was … harmless beyond a reasonable doubt.' "
(*People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 854.)

Here, the prosecutor accurately stated the law when explaining that proof beyond a reasonable doubt does not mean the evidence needed to be perfect or certain. (See CALCRIM No. 220 ["The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt"]; *People v. Pierce* (2009) 172 Cal.App.4th 567, 572-573 [CALCRIM No. 220 correctly states the law].) To the extent the prosecutor's remarks could be considered to incorrectly state the burden of proof, the trial court adequately directed the jury to the instructions and the law explained by the court, making any error on the prosecutor's behalf harmless. (See *People v. Castillo* (2008) 168 Cal.App.4th 364, 367, 386 [if trial judge promptly instructs jury to disregard prosecutor's improper statements during voir dire, error will ordinarily be cured].)

Similarly, the prosecutor's statement about the weight to afford defendant's voluntary intoxication was harmless. As discussed, the instruction the jury was told to follow when determining premeditation and deliberation charged the jury to consider the clarity of defendant's thought process when determining whether he acted deliberately. The instruction did not include an exception for voluntary intoxication. We presume the jury followed these instructions especially given the trial court's admonition. (*People v. Osband* (1996) 13 Cal.4th 622, 717.)

Finally, the prosecutor did not accuse defense counsel of fabricating a defense or deceiving the jury when making the challenged remarks, and instead accused defense counsel of misstating the law. The prosecutor's argument is fairly described as arguing the defense should be rejected based on the evidence and the law, which the jury was immediately reminded was contained in jury instructions provided by the court. We discern no deception or a pattern of egregious conduct on the part of the prosecutor designed to persuade the jury. Accordingly, there was no prosecutorial error.

## IV

### *There Was No Cumulative Error*

Defendant argues cumulative error resulted from the combined errors related to his jury instruction and prosecutorial error claims. Because we concluded there was no error affiliated with defendant's jury instruction and prosecutorial error claims, we conclude there was no cumulative error. (*People v. Chatman* (2006) 38 Cal.4th 344, 410.)

### DISPOSITION

The judgment is affirmed.

/s/
ROBIE, J.

We concur:

/s/
HULL, Acting P. J.

/s/
WISEMAN, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.